UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

13 JUL 31  PM 4: 33

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

| | |
|---|---|
| DECA FINANCIAL SERVICES, LLC and MR. TODD WOLFE | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| ECMC GROUP, INC., EDUCATIONAL CREDIT MANAGEMENT CORP., ECMC HOLDINGS CORP., PREMIERE CREDIT OF NORTH AMERICA, LLC, RICHARD J. BOYLE, ROBERT MECK, SHANE ARCHER, EDWARD H. JENNINGS, FRANK E. PETERSEN, GARY M. COOK, GREGORY A. VAN GUILDER, I. KING JORDAN, JAMES E. MURRAY, JOHN F. DePODESTA, ROBERT A. STEIN, ROBERTA COOPER RAMO, STEVEN A. WELLVANG, JAMES V. McKEON, MAURICE M. SALTER and JACK O'CONNELL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Cause No.:

**1 : 13 -cv- 1 2 2 2 TWP -MJD**

## COMPLAINT

DECA Financial Services, LLC ("DECA") and Mr. Todd Wolfe ("Mr. Wolfe", with

DECA, the "Plaintiffs") for their Complaint For Damages and For Declaratory and Permanent

Injunctive Relief against Defendants, ECMC Group, Inc., ("ECMC Group") Educational Credit

Management Corporation and ECMC Holdings Corp. ("ECMC Holdings") (Educational Credit

Management Corporation, Holdings and Group are collectively "ECMC"), Premiere Credit of

North America, LLC ("Premiere Credit"), Richard J. Boyle, Robert Meck, Shane Archer,

Edward H. Jennings, Frank E. Petersen, Gary M. Cook, Gregory A. Van Guilder, I. King Jordan,

James E. Murray, John F. DePodesta, Robert A. Stein, Roberta Cooper Ramo, Steven A.

Wellvang, James V. McKeon, Maurice M. Salter and Jack O'Connell (collectively, the "Defendants"), allege upon their knowledge as to their own acts and otherwise upon information and belief, the following:

## NATURE OF THE ACTION

1.      ECMC, through its wholly owned subsidiaries (and directly, through its failure to maintain corporate formalities), operates Premiere Credit in two highly profitable markets – the market to collect education loan debt for the United States Department of Education ("Department of Education") and the market to collect tax debt for the Indiana Department of Revenue ("IDOR"). The Department of Education market services a $36 billion education-related loan portfolio resulting in over $1 billion in revenues annually. It is considered the single most important collection-related market in the United States. The IDOR market involves the servicing of a $1 billion portfolio resulting in millions of dollars in revenue annually.

2.      Rather than compete fairly in these markets – something Defendants have not done with much success – Defendants made a decision, beginning in or about the fall of 2009, to use their market power to restrain trade in these markets. They did so by working individually and by conspiring collectively with their horizontal competitors to keep Plaintiffs – with their proven track record of excellent performance – from participating therein. Defendants did so to maintain their monopoly power in the IDOR market and to maintain their market share by effectively price-fixing in the Department of Education market. They did so by taking significant, illegal steps to exclude Plaintiffs from those markets including, without limitation: (i) engaging in a long-standing scheme to disparage Plaintiffs by making clearly false, material statements to market participants, IDOR and the Department of Education over a prolonged period of time with the intent that those entities would therefore refuse to work with Plaintiffs;

(ii) filing sham litigation and reporting the same to IDOR and the Department of Education; (iii) knowingly providing materially false information to the Internal Revenue Service about Mr. Wolfe thereby causing the IRS to audit Plaintiffs and (iv) actively conspiring with Premiere Credit's horizontal competitors to exclude DECA from the relevant markets in violation of the Sherman Act.

3.     Defendants actions are damaging Plaintiffs and the consumers in the relevant markets – including IDOR and the United States Department of Education – in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2.   Accordingly, Plaintiffs seek a declaration that Defendants' conduct is illegal; an injunction to halt Defendants' illegal conduct and prohibiting Defendants from further antitrust violations; and damages to be determined at trial that would be automatically trebled under federal law.   Plaintiffs do so to eliminate Defendants' illegal, anticompetitive arrangements so that Plaintiffs may compete in a free and open marketplace.

## THE PARTIES

4.     DECA Financial Services, LLC ("DECA") is an Indiana limited liability company with its principal place of business located in Fishers, Indiana.   DECA is a nationally licensed collection agency, which specializes in healthcare, education, financial services and municipal and state based debt.

5.     Mr. Wolfe is a resident of Marion County, Indianapolis, Indiana.   He is DECA's President, Chief Executive Officer and majority owner.   Prior to launching DECA, Mr. Wolfe was a co-founder of Premiere Credit and its President and Chief Operating Officer. Under Mr. Wolf's leadership, the company grew from two employees to more than 350 employees, and its active placement portfolio grew from less than $20 million in 2000, to more than $5 billion in

2009. In 2009 Mr. Wolfe was terminated and forced to sell his equity interest in Premiere Credit by ECMC and the other Defendants. Mr. Wolfe is a member and holds the designation of a Master Credit Executive with the American Collectors Association. His overall management style and business acumen has earned him numerous distinctions including, but not limited to, being recognized as a finalist for the Ernst and Young Entrepreneur of the Year award; being named to one of the Indianapolis Business Journal's Forty under 40 classes; and being recognized in INC. 500 for developing the fastest growing company in Indiana for three consecutive years.

6. Defendant ECMC Group is a Minnesota corporation recognized as a tax-exempt entity under section 501(c)(3) of the Internal Revenue Code with its principal place of business in Oakdale, Minnesota. ECMC Group owns and operates Holdings for-profit operations and owns and operates Educational Credit Management Corporation. All three entities operate without regard to normal or required corporate formalities and may be considered one person for liability purposes. For example, ECMC Group, ECMC Holdings and Educational Credit Management Corporation have one Board of Directors consisting of the same individuals – Defendants DePodesta, Jennings, McKeon, Stein, Ramo, Cook, Jordan, Salter and O'Connell. The ECMC entities share numerous employees, including senior management as set forth below. Further, a committee of the ECMC Board of Directors – the ARM (account receivable management) Committee – served as Premiere Credit's Board beginning at some point following Mr. Wolfe's termination and removal. This committee consisted of Defendants DePodesta, Jennings, McKeon, Salter and Stein. Finally, Defendant Meck is an ECMC Holdings employee but serves as Premiere Credit's President and Chief Executive Officer.

7.      Defendant Educational Credit Management Corporation is a Minnesota corporation recognized as a tax-exempt entity under section 501(c)(3) of the Internal Revenue code with its principal place of business located in Oakdale, Minnesota.  It is a national guaranty agency, insuring a $35 billion student loan portfolio.   Educational Credit Management Corporation operates throughout the United States.

8.      Defendant ECMC Holdings is a Delaware corporation with its principal place of business located in Oakdale, Minnesota.  ECMC Holdings describes itself as an investment holding company affiliated with Educational Credit Management Corporation, which operates throughout the United States.

9.      Defendant Premiere Credit is an Indiana limited liability company with its principal place of business located in Indianapolis, Indiana.  Premiere Credit describes itself as "one of the nation's leading accounts receivable management firms with over $4 billion of active inventory representing a diverse set of clients and assets classes."  Defendant ECMC Holdings purchased sixty percent of Premiere Credit in September, 2007.   Since October 27, 2009, Premiere Credit has been a wholly owned subsidiary of ECMC Holdings.

10.     Defendant Richard J. Boyle is ECMC Group's President and CEO and is a Board Member of each of the ECMC entities.  Mr. Boyle received $1.1 million in compensation in 2010, not including commuting expenses from his ranch in New Mexico to ECMC's place of business in Minnesota.  As described below, Boyle knowingly and personally participated in corporate acts and conduct in violation of the Sherman Act and other federal laws.

11.     Defendant Robert Meck is an employee of ECMC and serves as Premiere Credit's President and Chief Executive Officer.  Meck stated publicly that "I came on board in July 2009 and was cast with the challenge of transitioning a mature, but small entrepreneurial accounts

receivable management firm into a leading national accounts receivable management firm with the ability to grow both immediately and rapidly." As described below, Meck knowingly and personally participated in corporate acts and conduct in violation of the Sherman Act and other federal laws.

12.     Defendant Shane Archer is an officer of Premiere Credit and a former employee of Premiere Credit's competitor Account Control Technology, Inc. ("ACT"). As described below, Archer knowingly and personally participated in corporate acts and conduct in violation of the Sherman Act and other federal laws.

13.     Defendant Edward H. Jennings is a member of ECMC's Boards of Directors and the ARM Committee. As described below, Jennings knowingly and personally participated in corporate acts and conduct in violation of the Sherman Act and other federal laws.

14.     Defendant Edward L. Spear is a member of ECMC's Boards of Directors. As described below, Spear knowingly and personally participated in corporate acts and conduct in violation of the Sherman Act and other federal laws.

15.     Defendant Frank E. Petersen is a member of ECMC's Boards of Directors. As described below, Petersen knowingly and personally participated in corporate acts and conduct in violation of the Sherman Act and other federal laws.

16.     Defendant Gary M. Cook is a member of ECMC's Boards of Directors. As described below, Cook knowingly and personally participated in corporate acts and conduct in violation of the Sherman Act and other federal laws.

17.     Defendant Gregory A. Van Guilder is a member of Premiere Credit's Boards of Directors and is ECMC's Chief Financial Officer. As described below, Van Guilder knowingly

and personally participated in corporate acts and conduct in violation of the Sherman Act and other federal laws.

18.      Defendant I. King Jordan is a member of ECMC's Boards of Directors.  As described below, Jordan knowingly and personally participated in corporate acts and conduct in violation of the Sherman Act and other federal laws.

19.      Defendant James E. Murray is a member of ECMC's Boards of Directors.  As described below, Murray knowingly and personally participated in corporate acts and conduct in violation of the Sherman Act and other federal laws.

20.      Defendant John F. DePodesta is a member of ECMC's Boards of Directors and the ARM Committee.  As described below, DePodesta knowingly and personally participated in corporate acts and conduct in violation of the Sherman Act and other federal laws.

21.      Defendant Robert A. Stein is the Chairman of ECMC's Boards of Directors.  As described below, Stein knowingly and personally participated in corporate acts and conduct in violation of the Sherman Act and other federal laws.

22.      Defendant Roberta Cooper Ramo is a member of ECMC's Boards of Directors.  As described below, Ramo knowingly and personally participated in corporate acts and conduct in violation of the Sherman Act and other federal laws.

23.      Defendant Steven A. Wellvang was the President and Chief Executive Officer of ECMC Holdings, the General Counsel of Group and served on ECMC's Boards of Directors at all times relevant to this Complaint.  As described below, Wellvang knowingly and personally participated in corporate acts and conduct in violation of the Sherman Act and other federal laws.

24.     Defendant James V. McKeon is a member of ECMC's Boards of Directors and the ARM Committee.  As described below, McKeon knowingly and personally participated in corporate acts and conduct in violation of the Sherman Act and other federal laws.

25.     Defendant Maurice M. Salter is a member of ECMC's Boards of Directors and the ARM Committee.  As described below, Salter knowingly and personally participated in corporate acts and conduct in violation of the Sherman Act and other federal laws.

26.     Defendant Jack O'Connell is a member of ECMC's Boards of Directors.  As described below, O'Connell knowingly and personally participated in corporate acts and conduct in violation of the Sherman Act and other federal laws.

## OTHER CO-CONSPIRATORS

27.     As set forth below Defendants conspired with Premiere Credit's horizontal competitors including, without limitation, Account Control Technology, Inc. and MRS Associates, Inc. both of which are account recovery management companies that operate in or are attempting to obtain Department of Education contracts.

## JURISDICTION AND VENUE

28.     Plaintiffs bring this action for damages and injunctive relief to prevent Defendants' anticompetitive actions as violations of Sections 1 and 2 of the Sherman Act, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, for treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and for declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

29.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1337 (antitrust claims).

30.     Venue in this district is proper under 28 U.S.C. § 1391(b)(2), 15 U.S.C. §§ 15 and 22.

## ALLEGATIONS COMMON TO ALL COUNTS

**I.     Mr. Wolfe's Creation And Operation Of Premiere Credit.**

**A.     Premiere Credit and the Department of Education Student Loan Portfolio Contracts.**

31.     Mr. Wolfe founded Premiere Credit along with David Hoeft in 1999 as an accounts receivable management services provider. At all times relevant to this Complaint, Premiere Credit competed in a number of sophisticated accounts receivable management markets relating to the collection of federal government, state government, municipal, education and other debts.

32.     From its inception, however, Premiere Credit focused on competing in two markets: *first* and primarily, it looked to compete in the market for the collection of Department of Education's student loan portfolio debt. *Second*, Premiere Credit created and competed in the market for tax collections for the State of Indiana -- a market opened and created by the State of Indiana via legislation and regulations in conjunction with Premiere Credit under Mr. Wolfe's leadership and guidance.

33.     The Department of Education contract is the "plum" in the student loan collection industry. In the words of Defendant Meck, the "Department of Education contract is the most highly sought-after collection contract in the United States."

34.     The Department of Education manages an annual portfolio of defaulted student loans averaging over $36 billion. This portfolio is comprised of defaulted loans from the FFELP program, the Federal Direct Student Loan Program and the Perkins Loan Program.

35.     Every four years the Department of Education awards four-year contracts to private collection agencies for recovering the value of these loans (though these four-year contracts may be extended up to ten years).  There are currently approximately $67 billion of student loans in default.  The Department of Education places approximately 60 percent to 85 percent of this portfolio with private collection companies.  The total revenue opportunity for contracting private collection companies is approximately $1 billion annually.

36.     The Department of Education demands that its contracting agencies work to get debtors into a "rehabilitation" status – where the debtor makes nine loan payments over ten months.  When a debtor does this, the loan is considered rehabilitated and in good standing and the debt collection company obtains a commission not just on the payments made, but on the entire remaining loan balance.  From a cash flow perspective, this means that an agency must work each rehabilitation debtor for at least nine, often ten, months before it earns the most significant commission relating to that work.  A participating collection agency must, therefore, have the financial capability not just to manage this process, but also to incur the costs of doing so for nine months before the payroll and other expenses incurred relating thereto are covered by the successful completion of the rehabilitation.

37.     Department of Education contracts are awarded pursuant to a RFP and bid process.  The Department awards both Unrestricted (or large) contracts and Restricted (or small) contracts.  The former constitute the majority of the loan portfolio.  The latter are awarded to small businesses pursuant to the Department of Education's public policy goal of supporting and facilitating the growth of such businesses.

38.     There are currently a handful of collection agencies operating pursuant to a Department of Education contract - some Restricted and some Unrestricted.  A list of the Department of Education's current collection agencies exists at:

https://www.myeddebt.com/borrower/myoptions_collectionAgencies, which is accessible via a hyperlink from the http://studentaid.ed.gov/repay-loans/default/collections web portal.  This list includes Defendant Premiere Credit.

39.     Approximately 13 percent of the placed portfolio is provided to small businesses via the Restricted contracts.  The remainder is provided to participants in the unrestricted pool, who are in turn expected to contract 10% of their volume with small business subcontractors who are not Restricted contract participants.

40.     Accordingly, the net revenue opportunity for an Unrestricted contract holder is approximately $50 million per year.

41.     Absent collusion, the Department of Education student loan contract market is highly competitive, and a Department of Education contract is a difficult get.  A competitor in this market must, *inter alia*, (i) exhibit excellent historic performance in other student loan collection markets, (ii) demonstrate sufficient capitalization and stability so as to be viable during any contract's start-up period; (iii) utilize sophisticated IT systems and protocols; and (iv) demonstrate an excellent record of and capability for compliance and quality control.  As to the latter, debtor complaints are thoroughly investigated and can result in a contract bidder's denial or a contract holder's termination.

42.     Further, the Department of Education evaluates the performance of its collection agencies monthly, quarterly and annually using performance metrics.  Contract holders are measured on a relative scale against one another with the top performer obtaining a perfect score.

Contract holders receive significant bonuses quarterly and annually based on their performance with the top annual contract performer receiving a five-percent bonus.

43.     Accordingly, once a candidate obtains a Department of Education contract, it must maintain a high level of performance – vis-à-vis its competitors – or it will lose contract volume and, possibly, the opportunity to compete on the next Department of Education contract. If a contract holder maintains its performance, however, the financial rewards are manifest.

44.     This is because the recipients of a Department of Education contract make exceptional profits, with the best performers earning in the order of 20% to 25% or higher pre-tax.  Further, the bonus structure set forth above results in additional annual bonuses in the millions of dollars.

45.     Mr. Wolfe and Mr. Hoeft founded Premiere Credit with the primary objective of competing in the market for Department of Education contracts.

46.     Under Mr. Wolfe's leadership and management, Premiere Credit worked through the ranks from a small-business subcontractor, to a small business Restricted contract holder to a large business Unrestricted contract holder.  Knowing the significant, if not remarkable, barriers to entry into the Department of Education debt collection market, Defendants engaged in their illegal conduct in an effort to keep Mr. Wolfe from replicating his successes at DECA.

47.     At its inception in 2000, Premiere Credit tirelessly focused on collection services for schools and guarantee agencies to establish an excellent collections record relating to education-related debt – a necessary precursor to any Department of Education contract work.

48.     Premiere Credit – under Mr. Wolfe's leadership – initially took additional business in other debt collection markets to build a critical mass of business volume and

sufficient capital and human resources so that it could compete in the Department of Education market.

49.     Through Mr. Wolfe's unique, hands-on leadership and management approach, Premiere Credit was, in just four years, able to grow its business and to develop a sufficiently robust performance and compliance track record in education-related debt collection so as to compete for and win a small business (Restricted) Department of Education contract in 2004.

50.     Beginning with that contract, from 2004 through Mr. Wolfe's dismissal from Premiere Credit on June 30, 2009, Premiere Credit experienced remarkable growth and increasing profitability.

51.     Further, by mid-2007, Premiere Credit, under Mr. Wolfe's leadership and management, realized its goal to become one of the top performers for the Department of Education small business set-aside category.  As recognized by ECMC and the individual defendants at that time, Premiere Credit was – because of its outstanding performance in the Restricted category –a very likely recipient of an Unrestricted volume award in 2009.

52.     At that time, ECMC and Premiere Credit both knew that this increase in volume would increase modestly in 2009 and then ECMC forecast that it would grow dramatically beginning in the second quarter of 2010 resulting in a total revenue increase of up to $50 million dollars annually beginning in 2010.

**C.     Premiere Credit Creates The Indiana State Tax Collection Market.**

53.     Additionally, Mr. Wolfe and Premiere Credit worked with the State of Indiana in or 2006 to develop a market for and then secure a contract relating to the collection of unpaid state taxes using a new administrative wage garnishment process and bank-account garnishment techniques authorized by Indiana Code and regulations.

54.     In 2007, the State of Indiana passed legislation providing debt collection agencies operating on its behalf with access to bank account information and State unemployment tax remittance data of State tax debtors.  With this information, Premiere Credit could, as of the first quarter of 2007, find bank accounts of debtors and employers of debtors in Indiana relating to the collection of tax debt owed to the State of Indiana.

55.     In or about 2007, Indiana sent out a Request for Bids pursuant to RFP-8-49 for a Provider of Collection Services for IDOR in furtherance of its new tax collection procedures and methodologies.

56.     In relation thereto, IDOR established a three-step analysis process relating to the review and award of IDOR contracts.  This analysis was and remains as follows:

    a. *First*, IDOR evaluates whether the applying collection agency met its contractual requirements, which included regulatory, compliance and operational standards relating, *inter alia*, to pricing, equal opportunity provisions, Americans with Disabilities Act compliance, chief executive officer and chief financial officer responsibility requirements, adherence to regulatory and legal standards, confidentiality procedures, satisfactory references, regulatory registrations, etc.  This step is binary with applicants either passing to step 2 or failing.

    b. *Second*, IDOR evaluates each applicant's management, quality and pricing. In doing so IDOR evaluates, *inter alia*, each applicant's call center location, maintenance and management; its collection methodology and processes; its debt recovery models; its language (other than English) capabilities; its on-line payment and IT capabilities; its business plan; its use of permanent and/or

- 14 -

temporary employees and its training programs relating thereto; its disaster recovery plan; its ability to participate in the IDOR data match system; its ability to give all accounts equal and adequate attention; and its reporting capabilities. Applicants are given a score in relation to these issues.

    c.  *Third and finally*, applicants are scored on Buy Indiana, Indiana Economic Impact and Minority and Women Business Subcontractor Commitment categories.

57.    The second and third steps were and are weighted almost equally. In other words, an applicant's Buy Indiana and Indiana Economic Impact scores are almost as important as its operational scores. As such, Indiana-based companies have a distinct advantage in competing for the IDOR work. The universe of qualified Indiana companies is very limited.

58.    IDOR completed its initial evaluation and contract award on or about July 15, 2008. Premiere Credit, based in Indiana and operated by Mr. Wolfe, scored the highest of the thirteen proposals considered by Indiana – scoring 89.3 points. Its next highest competitor scored a 70.15.

59.    At that time IDOR awarded Premiere Credit a two-year contract with a two-year option.

60.    As of the second quarter, 2007, and prior to its purchase of Premiere Credit, ECMC estimated that the IDOR work, subsequently awarded in 2008, provided a significant revenue opportunity that may total up to $10 million annually after beginning slowly in 2007 and 2008.

61.    In fact, Premiere Credit has been the only IDOR contract holder since 2012. Prior to that time there were only two contract holders, one of which was Premiere Credit.

**II.    ECMC Ambushes Mr. Wolfe And Forces Him Out At Premiere Credit.**

62.     In or about the first quarter of 2007 ECMC began to look for investment opportunities in for-profit corporations.  ECMC focused on for-profit collection agencies because of the natural similarities between those businesses and ECMC's non-profit business operations.

63.     At or about this time, ECMC identified Premiere Credit as one such potential acquisition target.

64.     At this time Nelnet, Inc. ("Nelnet") owned 50% of Premiere Credit.  Mr. Wolfe and Premiere Credit's co-founder David Hoeft owned the majority of the remaining 50% and had contractual rights to manage and operate the company pursuant to its operating agreement.

65.     By June, 2007, ECMC was in serious negotiations with both Nelnet and with Messrs. Wolfe and Hoeft to purchase a controlling interest in Premiere Credit.  ECMC had to negotiate with both sets of parties as it was only interested in purchasing a controlling interest.

66.     ECMC's negotiations were led by Defendants Wellvang and Van Guilder subject to the approval and guidance of the other Defendants.

67.     Throughout the negotiation process, the parties understood the following:

a.  ECMC would purchase Nelnet's 50% ownership interest;

b.  ECMC would purchase some percentage between one percent and five percent from each of Mr. Wolfe and Mr. Hoeft;

c.  ECMC would, thereby, purchase a controlling interest in Premiere Credit;

d.  Mr. Wolfe would continue to run the company;

e.  Premiere Credit would likely obtain an Unrestricted Department of Education contract and, if it did, the purchase price would be increased because Premiere Credit's value would increase significantly;

f. Mr. Wolfe would remain involved as senior management at Premiere Credit so as to manage and share in its growth under an Unrestricted Department of Education contract; and

g. Mr. Wolfe would not necessarily have other sale options in the event he wished to sell his shares (which would become minority interests) or he was removed from management and, as such, any agreement should contain call and put rights.

68.    On August 31, 2007 ECMC Holdings – on ECMC Group letterhead – signed a Letter of Intent with Messrs. Wolfe and Hoeft that provided, *inter alia*:

a. ECMC Holdings' intent to purchase 50% of Premiere Credit's equity interest held by Nelnet;

b. ECMC Holdings' intent to, simultaneously, purchase a one to five percent interest from both Mr. Wolfe and Mr. Hoeft each;

c. Premiere Credit would operate independently from ECMC's other business interests;

d. Day-to-day management of Premiere Credit would vest in and remain with Messrs. Wolfe and Hoeft;

e. Premiere Credit would have a Board of Directors consisting of three ECMC-related persons and Messrs. Wolfe and Hoeft;

f. Any change in senior management would require the consent of the Premiere Board of Directors;

g. Messrs. Wolfe and Hoeft would be paid – like Nelnet – in two installments receiving a price per share at the closing as well as a price per share upon the award of an Unrestricted Department of Education contract; and

h. Messrs. Wolfe and Hoeft would, in addition, receive as part of the second payment a "control premium" reflecting ECMC's acquisition of a controlling interest in Premiere Credit.

69.     On September 28, 2007 ECMC Holdings entered into an Agreement for Purchase of LLC Membership interests with Messrs Wolfe and Hoeft in which Messrs. Wolfe and Hoeft each sold five percent interests to ECMC Holdings consistent with the parameters set forth above. ECMC Holdings also purchased Nelnet's 50% interest at that time.

70.     The Agreement for Purchase contained the automatic put and call options contemplated by the Letter of Intent. Pursuant thereto, if Mr. Wolfe ceased to be employed by Premiere Credit he was obligated to sell, and ECMC Holdings was obligated to purchase, his remaining 20.15 percent ownership interest at a price established by the Agreement for Purchase consisting of an EBITDA multiplier.

71.     Mr. Wolfe, with Mr. Hoeft's assistance, continued to operate and run Premiere Credit throughout the remainder of 2007 and through 2008. In 2008, Premiere Credit – through Messrs. Wolfe and Hoeft – prepared for and competed for an Unrestricted Department of Education contract.  In the meantime, it also continued to expand its Indiana tax-related portfolio.

72.     As part of these efforts, Mr. Wolfe continued to run Premiere Credit in such a manner that it remained a top performer on the Department of Education Restricted contract throughout 2008.

73.    On January 8, 2009 Premiere Credit, under Mr. Wolfe's leadership, received an Unrestricted Department of Education contract and began to gear up therefore.

74.    On June 30, 2009, without any forewarning or notice, the Defendants caused Premiere Credit to terminate Mr. Wolfe at a Premiere Credit Board meeting. Mr. Wolfe was not terminated for cause.

75.    Mr. Wolfe was not permitted access to Premiere Credit thereafter. In fact, ECMC unnecessarily humiliated Mr. Wolfe by hiring security to forcibly keep Mr. Wolfe from Premiere Credit's premises following the June 30, 2009 Board of Directors meeting and by informing employees and others that they were doing so.

76.    Defendants, individually and collectively, made their decision to terminate Mr. Wolfe many months before June 30, 2009 in a series of in-person and telephonic meetings among and between Defendants Wellvang, DePodesta, Cook and Boyle.

77.    Defendants did so in order to terminate Mr. Wolfe and to invoke the automatic buy-back provisions of the parties' agreement at a low price before Premiere Credit's EBITDA increased as a result of the upcoming unrestricted contract awarded in January 2009 and the anticipated increased volume resulting therefrom.

78.    As part of this process, beginning in or about April, 2009, Defendants met with Meck – who was unemployed at the time – regarding the possibility of him replacing Mr. Wolfe.

79.    Specifically, in April and May, 2009, Wellvang, DePodesta, Cook and Boyle met with Meck individually and/or collectively regarding Premiere Credit and their decision to terminate Mr. Wolfe in violation of their contractual relationships and fiduciary responsibilities.

80.    Pursuant to these meetings in June, 2009 – and prior to its Board Meeting at which Mr. Wolfe was terminated – ECMC Holdings hired Meck as an employee to act as

Premiere Credit's President and Chief Operating Officer. At all times since Meck, as an ECMC Holdings Employee, has acted as Premiere Credit's President, Chief Operating Officer and Chief Executive Officer. Meck has never been an employee of Premiere Credit.

81.    Throughout this process and by June 2009 at the latest, ECMC and its Board of Directors, with Meck, Wellvang, DePodesta, Cook and Boyle taking the lead, decided internally that they should and would, with Meck as their manager, be a top-three performer on the Unrestricted Department of Education contract out of the gate; that they would be the top performer within eighteen months; and, accordingly, Premiere – which would now be 100% owned by the ECMC Defendants – would reap the benefits of the higher volume and incomes and the considerable bonuses derived therefrom.

82.    This never occurred. In fact, Defendants found that competing in the Department of Education loan servicing market was much more difficult than they expected without Mr. Wolfe's expertise. To date, Premiere Credit has never scored higher than sixth on any quarterly Department of Education Unrestricted contract ranking since it forced Mr. Wolfe out; was ranked eleventh out of seventeen contract participants during the last quarter of 2012; and has not qualified for a single bonus since Mr. Wolfe was terminated.

83.    Defendants recognized this problem repeatedly. In January 2012, Defendant Boyle compiled financial information from Premiere Credit's competitors – available to ECMC as a guaranty agency – and concluded "PCNA's [Premiere Credit's] financial results to-date do not align with what we expected (or currently expect) from an ARM enterprise that has a major agency role with the Department [of Education] ...." Boyle specifically noted Premier Credit's competitor Pioneer's Pre-Tax margin of 31 percent and its EBITDA margin of 35.3 percent in 2009. He further noted that Premiere Credit "has not managed to be successful in any phase of

the human resource process – recruitment, training, motivation or retention" and asked "How did [Premiere Credit] manage to attract and retain competent collectors in the years before it was purchased by ECMC...," *i.e.*, while it was run by Mr. Wolfe.

84.     Premiere Credit has performed as badly with other clients since it forced Mr. Wolfe out.  For example, Sallie Mae, using similar criteria as those utilized by the Department of Education, "benched" Premiere Credit in 2012 drastically reducing Premiere Credit's Sallie Mae loan portfolio.

85.     As set forth below, Defendants ultimately determined that the way to resolve this issue was not to offer a better product, but rather to work with others to limit competition illegally in that market thereby rendering the Defendants' poor performance less damaging (as all contract participants are judged against one another rather than any absolute standard).

86.     From July through October, 2009 Defendants negotiated separately with Messrs. Wolfe and Hoeft to purchase Wolfe's and Hoeft's remaining ownership interests in Premiere Credit.

87.     On October 15, 2009, ECMC Holdings, Premiere Credit and Mr. Wolfe entered in to an Agreement for Purchase of LLC Membership Interest through which Mr. Wolfe sold his remaining 20.15 percent ownership interest to ECMC Holdings.   The October 15, 2009 Agreement contained a confidentiality provision.

88.     Premiere Credit received its first placements under the Unrestricted Department of Education Contract – obtained under Mr. Wolfe's leadership and acknowledged as the *raison d'etre* of the entire relationship between Defendants and Mr. Wolfe – one month later in November, 2009.   Despite the parties' promises and representations throughout their relationship, Mr. Wolfe obtained no benefit therefrom.

- 21 -

89.    As part of the October 15, 2009 Agreement, Mr. Wolfe entered in to a limited non-compete agreement whereby he agreed to not compete for Premiere Credit's current clients or those entities with whom Premiere Credit had provided services to over the past twelve months.

90.    Defendants compiled this list of clients (the "List"). Mr. Wolfe did not have access to Defendants' books or records and did not have knowledge sufficient to create or to challenge the List.

91.    Defendants compiled the List fraudulently. Instead of listing Premiere Credit's current or historic clients from the past twelve months as required by their contractual obligations, Defendants purposefully and knowingly compiled a list of all prior clients and a wish list of all possible clients the Defendants thought Premiere Credit might want to bid on at some point in the future. They did so specifically to keep Mr. Wolfe out of the markets relating to those clients, thereby reducing competition in those markets.

92.    Defendants created the List knowing and with the intent that Mr. Wolfe would have to rely thereon. Indeed, Defendants explicitly denied Mr. Wolfe's request that he be permitted to examine their records relating thereto stating that he would be arrested if he attempted to review books and records at Premiere Credit.

93.    Mr. Wolfe therefore had no choice, and reasonably relied on the List. Until July 14, 2011 – when the fraudulently induced non-compete expired – neither he nor DECA competed for work from or with the entities included on the List including IDOR and the Department of Education.

94.    Additionally, the October 15, 2009 Agreement contained a mutual non-disparagement clause that was only adhered to by Mr. Wolfe. As set forth below, Defendants

purposefully and knowingly violated this provision repeatedly over an extended period of time by making clearly false, material statements regarding Mr. Wolfe and DECA to clients and market participants, including IDOR and the Department of Education designed to create reliance thereon by those persons with the intent of keeping Mr. Wolfe and DECA out of the relevant markets and, thereby, reducing competition therein.

95.     When Mr. Wolfe initially raised concerns regarding this conduct, Defendants repeatedly assured him that they were acting in accordance with their contractual obligations as part of their efforts to further hide their ongoing anticompetitive conduct.

96.     Defendants also leveraged Mr. Hoeft out of his management and ownership position at Premiere Credit and on October 27, 2009, ECMC Holdings, Premiere Credit and Mr. Hoeft entered in to an Agreement for Purchase of LLC Membership Interest. At or about this time, ECMC Holdings also purchased Ms. Tina Mercer's – the only other minority shareholder – six percent ownership. Accordingly, as of October 27, 2009, ECMC owned 100% of Premiere Credit.

97.     Defendants found, however, that without Mr. Wolfe's leadership competing in the relevant markets was more difficult than they anticipated. Accordingly, as set forth below, beginning in or about September or October 2009 Defendants knowingly and purposefully engaged in a pattern of illegal, anticompetitive behavior to reduce competition in the relevant markets thereby protecting their position therein without having to compete with Plaintiffs or others.

98.     In short, Defendants began a pattern of illegal and anticompetitive behavior designed to monopolize the IDOR market and to reduce competition in the Department of Education market including, *inter alia*, their (i) fraudulently obtaining the purported non-

compete set forth in the October 15, 2009 Agreement with Mr. Wolfe; (ii) improper attempts to enforce the non-compete provisions via sham litigation; (iii) intentionally providing materially false information to the Internal Revenue Service so as to effectuate their illegal conduct; (iv) conspiring with their horizontal competitors to effectively reduce competition, maintain market share and price fix relating to the Department of Education contracts; and (iv) engaging in other fraudulent, anticompetitive or illegal conduct to monopolize the relevant markets as set forth below.

## III.     Defendants' Illegal Conduct Under The Sherman Act.

99.     Defendants have and continue to injure Plaintiffs, consumers and competitors by, *inter alia*, working individually and collectively with horizontal competitors to monopolize the market for IDOR tax collection services and to reduce competition and price fix in the market to provide collection services to the Department of Education.

## A.     The Relevant Markets.

100.     Defendants have restrained competition in and acquired and attempted to acquire a monopoly in the market for the provision of collection services to the IDOR. This is a national market, but because of the significant weight IDOR gives to Buy Indiana and Indiana Economic Impact scores, it is virtually impossible for companies outside of Indiana to compete with qualified market participants in Indiana. Defendants have restrained competition in this market and have attempted to illegally acquire and maintain a monopoly in this market. Significant barriers to entry exist in relation to this market given the historic performance and compliance record any market participant must demonstrate; the technological, capital and performance-based requirements for market participants; and IDOR's focus on Indiana-based market participants.

101.    Defendants have also restrained competition in and have engaged in *per se* illegal bid rigging in the market for the provision of collection services to the Department of Education. Defendants have restrained competition in this market by, *inter alia*, conspiring with their competitors to keep Plaintiffs out of the market thereby decreasing competition therein and reducing the impact thereon of Plaintiffs' likely high performance *vis-à-vis* Premiere Credit. Significant barriers to entry exist in relation to this market, as set forth above, relating to, *inter alia*, the historic performance and compliance record any market participant must demonstrate; the technological, capital and performance-based requirements for market participants; and the reality that new market participants must have sufficient capital and resources to compete, gear up and perform for a period of approximately one-year before they begin to earn significant commissions relating to their work.

**B.    Defendants' Illegal Conduct – Monopolization of the IDOR Market.**

102.    Since approximately 2012, Premiere Credit has been the only entity providing collection services to IDOR.  There were only two providers previously, one of which was Premiere Credit.

103.    Defendants knew that so long as they kept DECA out of the market, there are no competitors with the combination of capabilities, performance, compliance and Indiana connections capable of competing with Premiere Credit for the IDOR work.

104.    Accordingly, beginning in or about October, 2009, Defendants began to engage in illegal conduct designed to keep Mr. Wolfe and DECA out of the IDOR market and to illegally maintain their monopoly therein.

105.    As part of this illegal scheme, and as set forth above, Defendants created the fraudulent List.

106.    Further, beginning in or about September or October, 2009, Defendants began a concerted effort to disparage Mr. Wolfe and DECA to IDOR, the Department of Education and other market-related participants.  They did so despite their obligation, set forth in the October 15, 2009 Agreement, to not do so, in order to inhibit competition.

107.    This disparagement included clearly false, material statements made to others without knowledge of their truth or falsity with the intent that they would induce reliance thereon.  They were made for a prolonged period of time, and they were not readily susceptible to neutralization or offset.

108.    For example Meck:

        a.  Informed the Department of Education that Premiere Credit was a frequent violator of the law under Mr. Wolfe's leadership.  This statement was false and material.  Meck knew it was false and material and made the statement with the intent that the Department of Education rely thereon and exclude Mr. Wolfe and DECA from the Department of Education market.  Meck made such statements to the Department of Education and others over a period of months, if not years.  The damage resulting therefrom is irreparable and cannot be readily remedied;

        b.  Informed the IDOR that Premiere Credit was a frequent violator of the law under Mr. Wolfe's leadership.  This statement was false and material.  Meck knew it was false and material and made the statement with the intent that IDOR would rely thereon and exclude Mr. Wolfe and DECA from the IDOR market.  Meck made such statements to IDOR and others over a period of

- 26 -

months, if not years.  The damage resulting therefrom is irreparable and
cannot be readily remedied;

c.   Repeatedly informed Premiere Credit management and personnel that Mr.
Wolfe was unethical; he violated the Fair Debt Collection Practices Act; he
may have bankrupted Premiere Credit; he instructed employees to forge
documents; he would not do anything "by the book"; and that he refused to act
in compliance with applicable rules and regulations.  These statements were
false and material.  Meck knew they were false and material and made the
statements with the intent that Premiere Credit management and employees
would go in to the relevant markets and spread these falsehoods.  Meck made
such statements to Premiere Credit management and employees over a period
of months, if not years.  The damage resulting therefrom is irreparable and
cannot be readily remedied.

d.   Meck met with other market participants to spread falsehoods.  For example,
Meck met with Mr. Pat Magee in mid-October 2009 under the pretense of
interviewing Mr. Magee for a position at Premiere Credit.  Meck did not
discuss Mr. Magee's qualifications – admitting instead that Magee was not
being seriously considered for the position.  Rather, he used the interview to
spread additional falsehoods regarding Mr. Wolfe including, *inter alia*:

   i.   That Mr. Wolfe approved and supported debt collection scripts that
   were "blatant violations" of the Fair Debt Collection Practices Act;

   ii.   Mr. Wolfe violated regulations and laws regarding the use of
   automated number information systems;

     iii.  Mr. Wolfe committed these violations with knowledge of the alleged illegality of his purported actions; and

     iv.  Premiere Credit was in "ridiculously bad shape" because of Mr. Wolfe's poor management and leadership; and

e.  Meck made similar false statements during the course of an interview with another market participant – Mr. Anthony Shy – in 2010 stating, *inter alia*, Premiere Credit's former owner (Mr. Wolfe) was non-compliant with the law and that Premiere Credit had moved away from its old, non-compliant way of doing business. These statements were false and material. Meck knew they were false and material and made the statement with the intent that Mr. Shywould go in to the relevant markets and spread these falsehoods.

f.  Meck made similar false statements to outside contractors who provide services to market participants. For example, in 2009 and 2010 Meck told Mr. Chad Edmonson that Mr. Wolfe was non-compliant with the law and that Meck would ensure that Mr. Wolfe would never work in the industry again.

109.    Further, Defendants made disparaging statements regarding Mr. Wolfe and DECA to their competitors in the Department of Education market. As set forth below, these statements served two purposes. *First*, they were intended to keep Mr. Wolfe and DECA out of the small business subcontracting work by disparagement and *second*, they were an invitation to Defendants' competitors to conspire with Defendants to ensure that Mr. Wolfe and DECA were excluded from the Department of Education market on an ongoing basis thereby reducing competition therein.

110.    Additionally, Defendants brought sham litigation against DECA and Mr. Wolfe in an attempt to gain a competitive advantage and to damage Plaintiffs' ability to compete in the relevant markets.

111.    On November 10, 2011, Defendants caused ECMC Holdings and Premiere Credit to file a lawsuit in Marion County, Indiana against Mr. Wolfe, DECA and a number of other individuals including, without limitation, Mr. Wolfe's ex-wife Natalie Wolfe, current DECA employees and even current Premiere Credit employees (the "Litigation"). The Litigation was assigned to Superior Court 6, Cause No. 49D06-1111-PL-043502.

112.    The Litigation complaint purported to be verified by Defendant Meck, though it lacked a verification clause. It contained numerous statements Defendants knew to be false. Additionally, Defendants attached confidential documents, including the October 15, 2009 Agreement, to their Complaint and filed the same in open court. Plaintiffs voluntarily dismissed their initial complaint but then filed an amended and then a second amended complaint, both of which incorporated the same frivolous, unreasonable and groundless claims.

113.    Defendants acknowledged their bad-faith objective in filing the Complaint was not to vindicate any legitimate right, but was rather to damage DECA and Mr. Wolfe because Defendants did not want DECA or Mr. Wolfe competing in the relevant markets. For example:

    a.  Defendants decided to commence litigation after Defendant Meck saw Mr. Wolfe at a quarterly Department of Education meeting (after Mr. Wolfe's fraudulently induced non-compete had expired). Defendant Meck recommended that Defendants commence litigation – a decision approved of by the other Defendants via meetings and a Board of Directors meeting; and adopted and ratified by the ECMC Defendants;

b. Defendants filed the Lawsuit without investigating DECA's business operations or taking steps to identify or confirm any alleged violations by DECA or Mr. Wolfe;

c. Defendants filed the Lawsuit knowing that they did not have and could not prove any damages;

d. Defendants previously acknowledged that they had no information, when they filed their lawsuit, that Mr. Wolfe or DECA had done any Department of Education-related work prior to the July 14, 2011 expiration of Mr. Wolfe's fraudulently induced non-compete (and in fact DECA had not done so), yet they filed the "verified" complaint in the Litigation repeatedly alleging such violations regardless;

e. Defendants previously acknowledged that they could not state that it was more probable than not that any of the individuals they sued solicited anyone to leave Premiere Credit, yet they alleged in their verified complaint, that this occurred.

f. Defendants filed their Lawsuit because they were afraid that if DECA was able to compete in the relevant markets, it would inhibit their ability to do so.

114.    This subjective bad intent is further confirmed by the Complaint itself, which is resplendent with obvious errors and intended misstatements.  For example:

a. Defendants' "verified" complaint stated that Mr. Wolfe's non-compete required that he not be involved in the accounts receivable business in any way for two years despite the fact that they knew and have acknowledged that, even if the non-compete had been enforceable, Mr. Wolfe was entitled to

participate in that line of business so long as he did not compete for certain lines of work therein;

b.  Defendants alleged – in a verified complaint – that DECA was raiding Premiere Credit; DECA was obtaining and utilizing Premiere Credit's confidential information; and that DECA was using Premiere Credit's former employees to induce Premiere Credit employees to leave their employment, but subsequently admitted they had no proof that any of these things occurred;

c.  Defendants sued their own employee, Ms. Maria Ragona while she was on maternity leave, accusing her of being poached by DECA and Mr. Wolfe in violation of an alleged non-compete, while she was still working for Defendants and even though she had never worked for either Mr. Wolfe or DECA;

d.  Defendants sued three individuals, William Smith, April Gaskins, and Philip Hicks, who had never worked for DECA and accused them of being poached by DECA and Mr. Wolfe in violation of an alleged non-compete; Defendants could not identify a single customer it lost as a result of any alleged conduct by Mr. Wolfe, DECA or any of the other myriad of persons named as defendants in the Litigation; and

e.  Defendants included injunctive relief in the title of their complaint, made a request for injunctive relief in the body of the complaint, yet never sought or pursued injunctive relief against Plaintiffs, indicating Defendants knew they had no basis for such claims.

115.   Additionally, the lawsuit is objectively baseless.  The Marion County Superior Court granted summary judgment to most of the state-court defendants (Jesse Biddle, Jerry Buchanan, Timothy Corey, Mandy Duncan, Kimberly England, Craig Finkler, Sarah Hartmann, James Hefty, Scott Roberts, and Maria Leiva-Woodhouse) early in the litigation – a result Defendants did not even appeal.  The remaining state court defendants will move for summary judgment on Defendants' Litigation claims and have asserted counterclaims for frivolous litigation and abuse of process.

116.   Further, Defendants used the Litigation as an affirmative weapon to further disparage DECA and Mr. Wolfe.  Defendants caused Premiere Credit's manager, Archer, to contact IDOR, Sallie Mae and the Department of Education to inform them that Archer was conducting an investigation in to Mr. Wolfe's "violations" of his non-compete.

117.   In doing so, Defendants knew that DECA would have to disclose the Litigation in relation to its efforts to bid on any IDOR and Department of Education contract and that the Litigation would negatively inhibit DECA's ability to compete therefore.

118.   Additionally, Defendants knowingly and purposefully made false statements to the Internal Revenue Service ("IRS") to further inhibit Mr. Wolfe's and DECA's ability to compete.

119.   Beginning in 2011, the IRS commenced income tax audits for the 2009 tax returns of Holdings and Mr. Wolfe.  One of the issues the IRS examined during these audits was the character of the payments Holdings made to Mr. Wolfe in exchange for his membership interests in Premiere.

120.   Although Holdings and Mr. Wolfe treated the payments consistently on their 2009 Federal income tax returns, Defendants knowingly and purposefully made false statements to

IRS Revenue Agent Monte Johnson in connection with both Holdings' audit and Mr. Wolfe's audit relating to the nature and character of the payments Holdings made to Mr. Wolfe. These statements were not only false, but also were wholly inconsistent with the manner in which Holdings reflected the payments on its 2009 return, which was signed under penalties of perjury.

121.   As a direct result of Defendants' false statements to the IRS, the IRS made adjustments to Mr. Wolfe's 2009 tax return which may result in Mr. Wolfe owing significant additional tax, interest, and penalties to the IRS. Mr. Wolfe has expended, and continues to expend, a tremendous amount of time, effort, and expense in discovering and defending against these false statements, and in defending against and protesting the IRS adjustments which were predicated on these false statements.

122.   Defendants knowingly and purposefully made these false statements to the IRS to subject Mr. Wolfe to the time and expense of additional scrutiny by the IRS in order to tie up Mr. Wolfe's time and resources to further inhibit Mr. Wolfe's and DECA's ability to compete.

123.   Defendants engaged in this conduct to keep their single, primary competitor – Mr. Wolfe and DECA – out of the IDOR market thereby permitting them to maintain their monopoly therein. They did so knowing that the market contains significant barriers to entry, as set forth above, and that by doing so, they could continue to reap significant financial profits in that market despite their poor performance and track record. In other words, their conduct permitted them to continue to sell a poor product at an inflated price to IDOR through the conclusion of the 2012 contract – 2014 – at a minimum.

124.   As such, Defendants have and continue to cause substantial injury to the market for the provision of collection services to IDOR. But for Defendants' conduct, IDOR would

have more and better contractual options and would be receiving better services and/or a better price.

125.    Plaintiffs have been, continue to be and shall be injured in the IDOR market in Indiana. But for Defendants' illegal conduct, DECA would have obtained an IDOR contract.

126.    Finally, Defendants' illegal conduct was knowingly approved by its Board of Directors who were informed of and approved the hiring of Meck, Meck's approach and conduct; the filing of sham Litigation; and the submission of materially false information to the IRS in order to ensure their asset's – Premiere Credit's – continued monopolization of the IDOR market.

127.    Further, the individual Defendants have benefitted therefrom in the form of financial remuneration and significant benefits from ECMC.

128.    Additionally, they have knowingly taken steps, individually and collectively, in attempt to hide their illegal conduct.

**C.    Defendants' Illegal Conduct – Conspiracy in Restraint of Trade in the Department of Education Market.**

129.    Additionally, Defendants conspired with their co-competitors to exclude Mr. Wolfe and DECA from the Department of Education market.

130.    Defendants did so, in part, via the anticompetitive conduct set forth above in paragraphs 102 through 128 of Complaint Section III.B.

131.    Defendants' pattern of defamatory statements, their bringing of sham litigation and their submission of materially false information to the IRS were all equally intended to damage competition and to keep Mr. Wolfe and DECA out of the Department of Education market as they were intended to keep Mr. Wolfe and DECA out of the IDOR market.

- 34 -

132.   Defendants, however, did not have unilateral market power in the Department of Education market as they have in the IDOR market.   Accordingly, in the Department of Education market, Defendants also conspired with others.

133.   As set forth above, the Department of Education awards large, Unrestricted contracts and small, Restricted contracts.  Further, each holder of a large, Unrestricted contract must provide ten percent of their volume via a subcontracting relationship to a small business that does not otherwise hold a small, Restricted Department of Education contract.

134.   Further, as described above, each contract holder's performance is reviewed monthly by the Department of Education on a sliding scale.  Pursuant to this scale, contract holders are compared to one another.  The top performing contractor receives the highest score, regardless of whether their performance was objectively or subjectively exemplary or poor.  The lowest performing contractor receives the lowest score, regardless of whether their performance was objectively or subjectively exemplary or poor.

135.   Accordingly, market participants can fall in the rankings if other participants' performance improves and rise if other participants' performance worsens, even if their performance remains constant.

136.   This is critically important, because the Department of Education – in awarding the most important education-related collection contract in the United States – awards volume, bonuses and, eventually, renews contracts based on its vendors' historic performance.

137.   Defendants, of course, like all participants in the Department of Education market know this.  Additionally, they know one another's scores, as they are a matter of public record, and they have a myriad of opportunities to discuss the same.

138.    The Department of Education, for example, has quarterly meetings attended by all of its contractors.  Additionally, market participants routinely hire personnel from one another. In short, market participants have a multitude of opportunities to discuss the market and their business practices with one another, and they do so.

139.    Against this backdrop, large contractors are also aware that a significant portion of their performance, and their Department of Education score, derives from the work of their mandatory small business subcontractor.

140.    By the summer of 2010, Defendants became concerned that Mr. Wolfe and DECA would again enter in to the Department of Education market following the conclusion of Mr. Wolfe's fraudulently obtained non-compete and that Mr. Wolfe would use his expertise, experience and unique business model and acumen to do what he did previously with Premiere Credit:

    a.  To be a top performing small business subcontractor;

    b.  To parlay that performance in to a small, Restricted Department of Education contract;

    c.  To become a top performer therein;

    d.  To parlay that performance in to an Unrestricted, large Department of Education contract; and

    e.  To take volume from Defendants and other market participants by doing so.

141.    Rather than take competitive steps to improve their product – one of the poorest in the Department of Education stable – Defendants decided instead to take anticompetitive steps to keep Mr. Wolfe and DECA out of the market.  They did so to reduce competition in the

- 36 -

Department of Education market and, thereby, to reduce losing their volume and perhaps their contract.

142.    This was critically important to Defendants because the Department of Education work was, by far, Premiere Credit's most profitable line of business.  In 2012, for example, Premiere Credit made 12 percent net profit on its Department of Education work, 3.9 percent on its guarantee agency work and lost 3.9 percent on its other government work.  Further, Premiere Credit projected that, because of its anticompetitive conduct, it could – without improving its product or otherwise competing – increase its weighted net profit annually to 25.6 percent by 2017, with its Department of Education net profit margin approaching 40 percent.

143.    In short, Defendants became concerned that DECA could go to work as a subcontractor for one of their competitors and, based on DECA's and Mr. Wolfe's track record, thereby improve that competitors' ranking, improve competition in the market generally, and take volume from Defendants and others.  This reality threatened Defendants' scheme to obtain a remarkable 40% net profit margin without competing relating thereto or providing a better product to the Department of Education therefore.

144.    As stated by Meck in the Litigation:

Q.    How would Premiere go about trying to determine if it lost any revenue on the Department of Ed contract?

A.    Have to evaluate the rankings of the different companies.

Q.    What do you mean?

A.    Having to identify who got more placements based on performance.

Q.    And how would that help you determine if you had lost business to DECA?

A.    If whoever they [DECA] were subcontracting for helped performed and rose on the ranks, they would have gotten more placements.

145.   In or about late July, 2010, Defendants concerns were realized.  Defendants discovered that, following the expiration of Mr. Wolfe's fraudulently induced non-compete, Mr. Wolfe and DECA were starting to compete for subcontract work and had, in fact, entered in to a contract to provide subcontracting services to Progressive Financial Services ("Progressive").

146.   Since that time DECA has performed remarkably well on behalf of Progressive thereby affecting its performance scores and metrics.

147.   The pro-competitive business response to DECA's arrival in the market is readily apparent: Premiere Credit and other market participants should either hire DECA themselves or take other steps to improve their subcontractor performance and their own product.  These are the types of pro-competitive behavior expected by the free market system and expressly encouraged by federal antitrust laws.

148.   Defendants, however, did not engage in such pro-competitive conduct.  Instead, they engaged in conduct that was against their economic interest and only makes sense in light of an antitrust conspiracy.

149.   Defendants began, in or about July or August, 2011 to reach out to their direct competitors regarding DECA and Mr. Wolfe and to enter into agreements with those competitors to not work with, to defame and to otherwise exclude Mr. Wolfe and DECA from the market.

150.   Specifically, Defendants, through Meck and Archer, talked to their competitors to determine which competitors DECA had approached regarding possible subcontract work.

151.   Meck and Archer on behalf of Defendants engaged in conversations with Premiere Credit's competitors designed to limit competition in the marketplace relating to DECA

and Mr. Wolfe specifically and their clients generally. At a November, 2011 Credit and Collections Conference, for example, Meck exchanged confidential business information and practices with his competitors to limit competition in the marketplace.

152. At this conference Meck discussed Mr. Wolfe with Mr. Don Siler of MRS Associates, Inc. – a New Jersey based account receivables management company and Premiere Credit's competitor.

153. Further, and remarkably, they also exchanged confidential business and pricing information. For example, Siler informed Meck that First Marblehead Private Credit was MRS's largest client; that MRS was deriving their largest margin from its First Marblehead Private Credit business; and that Premiere Credit should get into First Marblehead Private Credit Business. Meck passed this information on to Defendants in an e-mail to Defendants' Wellvang and Archer among others concluding "We really need to get into Marblehead."

154. No pro-competitive business reason or justification exists for Premiere Credit and MRS exchanging this confidential business information regarding Wolfe, DECA or First Marblehead Private Credit.

155. At this time – November, 2011 – Defendants also filed the sham Litigation.

156. Further, beginning in November, 2011, Defendants – after filing the Litigation – proceeded to delete senior management's e-mails at Premiere Credit, including those belonging to Defendants Meck and Archer so as to hide their illegal conduct. By February, 2012, Defendants deleted and destroyed at least 750,000 e-mails. Despite their intent to destroy all evidence, it became clear during the Litigation that Defendants' engaged in the illegal conduct described in this Complaint.

157.    Defendants, through primarily Meck and Archer, also had conversations with representatives of ACT and, on information and belief, others, for the purpose of obtaining an agreement to not work with Mr. Wolfe or DECA so as to keep them out of the Department of Education market and to reduce competition therein.

158.    ACT shared Defendants' history of attempting to exclude Mr. Wolfe.  In or about 2004, for instance, ACT filed a petition with the Department of Education challenging Premiere Credit's – then owned and operated by Mr. Wolfe – small business designation in an effort to keep Premiere Credit from Department of Education work.

159.    In their conversations with ACT, Meck and Archer continued their pattern of disparagement – again informing ACT and others that Mr. Wolfe was, among other things, a criminal, a thief and non-compliant and that, by association, DECA must be as well.

160.    Additionally, Meck and Archer obtained an agreement from ACT to not work with DECA and/or Mr. Wolfe so as to exclude them from the Department of Education market.

161.    Defendants and ACT explicitly acknowledged their illegal agreement and moved to work cooperatively relating thereto by, *inter alia*, sharing employees and confidential business information and working cooperatively to exclude DECA and reduce competition.

162.    Until approximately November, 2009, for example, Archer was employed by ACT.  At that time, he came to work for Premiere Credit under the management of ECMC Holdings' employee Meck.

163.    While at ACT, Archer developed a collection strategy based on scoring accounts and rotating account inventory.  This system, in a competitive market, was or should have been proprietary and confidential.

164. ACT, however, shared this system with Defendants so as to cooperate and reduce competition. Defendants, via Archer, reached out to ACT – his former employer. Through a series of conversations with Don Taylor at ACT, Defendants and ACT discussed and shared confidential business information relating to ACT's collection strategy and the results therefrom as well as Mr. Wolfe and DECA. As set forth above, Taylor and ACT had a history with Mr. Wolfe. Meck would have known this and, as such, Taylor was a perfect place to start any efforts to keep Wolfe and DECA out of the market.

165. In these conversations, Archer incorrectly informed Taylor that Premiere Credit was in real trouble because of Mr. Wolfe's fraudulent and illegal conduct and Taylor gave Archer updates regarding ACT's operational success utilizing the new strategy.

166. Through this process and these conversations, Defendants and ACT came to an understanding that neither would work with Mr. Wolfe and/or DECA and that both would take steps to keep them out of the Department of Education contract and to inhibit competition therein.

167. Defendants engaged in this conduct to keep a better, primary competitor – Mr. Wolfe and DECA – out of the Department of Education market thereby permitting them to maintain their market shares and their high profits thereby effectively ensuring their market shares and price-fixing (and service fixing) in the Department of Education market. They did so knowing that the market contains significant barriers to entry, as set forth above, and that by doing so, they could continue to reap significant financial profits in that market despite their poor performance and track record. In other words, their conduct permitted them to continue to sell a poor product at an inflated price to the Department of Education.

168.   Defendants conduct does not make sense and cannot be explained by rational business decisions or normal, pro-competitive self-interest.  Rather, Defendants' conduct, and that of their competitors, can only be explained by a group decision by horizontal competitors to reduce competition thereby benefiting them all at the expense of DECA, Mr. Wolfe and the market.

169.   Defendants have caused and continue to cause substantial injury to the market for the provision of collection services to the Department of Education.  But for Defendants' conduct, the Department of Education would have more and better contractual options and would be receiving better services or better pricing.

170.   Plaintiffs have been, continue to be and shall be injured in the Department of Education market nationally.  But for Defendants' illegal conduct, DECA would have additional Department of Education contract work.

171.   Finally, Defendants' illegal conduct was knowingly approved by its Board of Directors who were, individually and collectively, informed of and approved the hiring of Meck, Meck's approach and conduct; the filing of the sham Litigation; and the submission of false and material information to the IRS in order to ensure their asset – Premiere Credit's – continued market share and successful bid application in the Department of Education market.

172.   Further, the individual Defendants have benefitted therefrom in the form of financial remuneration and significant benefits and bonuses from ECMC.

173.   Additionally, they have knowingly taken steps, individually and collectively, in attempt to hide their illegal conduct.

**D.      Defendants' Actions Affect Interstate Commerce.**

174.    Defendants' anticompetitive conduct occurred and continues to take place in interstate commerce and restrained trade and commerce among the States and in the markets identified and will continue to do so in the future.

## Count I

### (Violations of Section 1 of the Sherman Act)

### Contract, Conspiracy, or Combination in Restraint of Trade, 15 U.S.C. § 1

175.    Plaintiffs repeat and re-allege paragraphs 1-174 as though fully set forth herein.

176.    Premiere Credit and its competitors, including without limitation ACT and MRS are horizontal competitors and independent legal entities engaged in an ongoing conspiracy, contract, or combination, among themselves and with certain of their directors and officers, the primary object of which is to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

177.    As alleged herein, Defendants' scheme unreasonably restrains trade by:

    a.  Boycotting potential competitors, such as DECA, by collectively refusing to deal with these qualified contractors and subcontractors that might enter the market and increase competition therein;

    b.  Horizontally ensuring the conspirators' ongoing market shares and market participation free from competition from new, better competitors; and

    c.  Effectively price fixing and ensuring market shares in the Department of Education contracts by conspiring to limit the pool of "adequate" historic performers relating thereto.

178.    The Defendants' anticompetitive conduct has had a significant adverse effect on competition in the relevant market for the Department of Education contracts, causing direct and

proximate harm to consumers and market participants as described above.

179.    The anticompetitive conduct orchestrated, facilitated and enforced by Defendants in this case is precisely the type of pernicious agreement that is ordinarily condemned as a matter of law as illegal *per se* because of the certainty that such practices are anticompetitive.  The Defendants' conduct therefore is subject to the *per se* analysis.

180.    Further, and regardless, Defendants and their co-conspirators have market power in the Department of Education contract market and in sub-markets relating thereto, including the market for small business subcontract work.  Additionally, no pro-competitive justifications exist for Defendants' conduct.  Accordingly, Defendants' conduct cannot survive even a Rule of Reason analysis, in the event the Court determines such an analysis is appropriate in whole or in part.

181.    The actual, probable and intended effects of Defendants' anticompetitive agreements and conduct have caused and continue to cause injury to Plaintiffs.  Further, they have distorted and caused injury to competition in the United States, including in the market for and the markets relating to the Department of Education contract.

182.    Plaintiffs and competition will continue to be so injured unless the Defendants and those acting in concert with them are enjoined from continuing to engage in the foregoing violations of law.

## Count II
### (Violation of Section 2 of the Sherman Act)
### Monopolization

183.    Plaintiffs repeat and re-allege paragraphs 1-182 as though fully set forth herein.

184.    At all relevant times, Premiere Credit possessed monopoly power and substantial market power in the IDOR market.  Premiere Credit possesses 100% of the relevant market share

of the market in the State of Indiana.

185.    Defendants willfully obtained and exercised complete dominance and monopoly power over this market.  Given the significant barriers to entry, and Defendants' relationship with and misrepresentations to IDOR, they also have the power to exclude competitors from the IDOR market.

186.    Defendants have willfully maintained their monopoly power in the IDOR market. It was the Defendants' conscious objective to further their dominance and to solidify their monopoly in the IDOR market through their conduct described above.

187.    Defendants willfully obtained and maintained their monopoly power in the IDOR market by restrictive and exclusionary conduct rather than by means of legitimate competitive activities, business acumen or historical accident.  Defendants have used their monopoly power to shield themself from the rigors of competition and prevent the development of competing entities capable of providing the required services in Indiana.

188.    Defendants' willful maintenance of monopoly power has made it difficult or impossible for competitors to engage in fair competition.  The conduct taken by Defendants have injured consumers; competition in the relevant markets; and Plaintiffs (and others similarly situated)

189.    Defendants' anticompetitive conduct has directly and proximately caused injury and damage to Plaintiffs' business and property interests, as set forth above.

190.    The actual, probable and intended effects of the foregoing acts and practices, and the continuing course of Defendants' anticompetitive conduct, has caused injury to consumers and to competition in the IDOR market.

191.    Plaintiffs and competition will continue to be so injured unless Defendants and

- 45 -

those acting in concert with them are enjoined from continuing to engage in the foregoing violations of law.

## Count III
### (Violation of Section 2 of the Sherman Act)
### <u>Attempt to Monopolize</u>

192.    Plaintiffs repeat and re-allege paragraphs 1-191 as though fully set forth herein.

193.    Defendants have engaged in restrictive, exclusionary, and anticompetitive conduct, as described above, with the specific intent to monopolize the IDOR markets.

194.    Premiere Credit possesses 100% of the relevant market share of the market in the State of Indiana.

195.    Defendants have succeeded in monopolizing the IDOR market. Further, there is a dangerous probability that Defendants' conduct, described above, will succeed in further solidifying and entrenching Defendants' monopoly in the IDOR market.

196.    Defendants' anticompetitive conduct has directly and proximately caused injury and damage to Plaintiffs' business and property interests, as set forth above.

197.    The actual, probable and intended effects of the foregoing acts and practices, and the continuing course of Defendants' anticompetitive conduct, has caused injury to consumers and to competition in the IDOR market.

198.    Plaintiffs and competition will continue to be so injured unless Defendants and those acting in concert with them are enjoined from continuing to engage in the foregoing violations of law.

## Count IV
### <u>Permanent Injunctive Relief</u>

199.    Plaintiffs repeat and re-allege paragraphs 1-198 as though fully set forth herein.

200.    The actions complained of by Plaintiffs, as previously set forth, will result in irreparable harm.

201.    There is a strong likelihood that Plaintiffs will succeed on the merits of its claims.

202.    The public interest will be furthered by the entry of permanent injunctive relief restraining Defendants' unlawful acts.

203.    The harm to Plaintiffs and the interests of competition substantially outweighs the harm, if any, to Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Mr. Todd Wolfe and DECA Financial Services, LLC, respectfully request that the Court enter judgment in its favor and against the Defendants as follows:

A.    An award to the Plaintiffs of three times the damages that they have sustained as a result of the Defendant's antitrust violations as provided for by Section 4 of the Clayton Act, 15 U.S.C. Section 15, including the damages sustained while this litigation is pending, the amount of which is ongoing and is not presently known.

B.    Declaratory relief issued pursuant to 28 U.S.C. §§ 2201-2202 that Defendants' conduct is unlawful in violation of Sections 1 and 2 of the Sherman Act.

C.    A permanent injunction barring Defendants, and all persons and entities acting in concert with them, from further violating the rights of Plaintiffs, and others similarly situated, including but not limited to provisions barring Defendants from any ongoing or additional illegal, anticompetitive conduct.

D.    An award of the Plaintiffs' costs of litigation, including reasonable attorneys' fees as provided for by Section 4 of Clayton Act, and other applicable laws.

E.     An award of pre-judgment and post-judgment interest, as provided by law.

F.     Such other and further relief as the Court may deem just.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury as to all issues so triable.

Dated: July 31, 2013

Respectfully submitted,

Hamish S. Cohen, No. 22931-53
Raymond J. Biederman, No. 28467-49
Barnes & Thornburg, LLP
11 South Meridian Street
Indianapolis, Indiana
46204

Attorney for Plaintiffs Todd Wolfe and DECA
Financial Services, LLC

INDS02 1280766v1